Case No. 20-5286 Shawnee Tribe Appellant v. Steven T. Mnuchin in his official capacity as Secretary of the United States Department of the Treasury et al. Ms. Thomas for the appellant, Mr. Bolham for the appellate. Ms. Thomas is now unmuted. Good morning. Good morning, Your Honors. And may it please the court. Pillar Thomas on behalf of the Shawnee Tribe, a federally recognized Indian tribe with over 3,000 tribal members, located in Oklahoma, a state with one of the worst COVID-19 outbreaks in the country. Your Honors, I'd like to make three points today here about the government's position and the lower court's decision that supports that position, that the government can, without any judicial review, use objectively and patently false data, the result of which flies in the face of the law's express intent. First, the government's use of objectively false data that has the tribe with a population of zero is legally and factually impossible, by definition, arbitrary and capricious, and the result is absurd and contrary to law. This federal determination, unbounded by actual facts or the record before them, is reviewable under the APA. Let's assume we agree with you that it's reviewable. I'm trying to understand your claim. The government says that it attempted to ascertain the population for each tribe in the formula area as defined by the Indian Housing Block Grant Program, correct? Yes, Your Honor. You don't allege that you had enrolled population inside your formula area, do you? Well, Your Honor, the tribe does not have a formula area. I'm sorry, there was a little bit of a pause in my video. Perhaps others got it. Could you repeat your answer? Zero population. Ms. Thomas, you're freezing up on me. I don't know if the other panelists are having a problem. Yeah, me too. Yeah, we had a temporary disruption in our internet. I apologize, Your Honor. To finish answering the question, the tribe doesn't have a formula area. It doesn't participate in the Indian Housing Block Grant Program. And the Indian Housing Block Grant Program formula at the heart of it is a census-based formula. Which, as we make in our complaint, is first of all race-based. It's not based on actual tribal enrollment population data. It's based on the census form, somebody checking whether they are of American Indian or Alaska Native descent, which is not the same as a tribal-based population. Secondly, the tribe doesn't have a census tract, so it will have zero population under the census. And that's why it has a zero population under the IHBG formula. There were three tribes that the government said did not participate in the IHBG program. But the government basically ascertained, this is at the supplemental appendix at 103, that they ascertained what population could be attributed to their defined formula areas, the Chicken Ranch, Mohegan, Prairie Island. Are you alleging that something like that could have been done for your client, but it wasn't? Yes, Your Honor. In fact, that's the point we made in the lower court as well. That once the government used the IHBG formula and saw that not only for Shawnee tribe, but in fact for 24 other tribes, they had a zero population in the column that the government looked at, that the government had at least two and maybe even three other pieces of data. If you look at the formula itself, which we have in our appendix, you go four columns over. There's a column that says HUD enrollment, and that's a number that the tribe provided to HUD with their enrollment numbers a few years ago. So it's only 2,111. The government asked the tribes in April to submit certified documentation, including a certification under penalty of perjury of their tribal enrollment data. I don't want to cut you off, but I want you to answer my question specifically. My question specifically is that they said that for these three tribes at SA-103, they found out what their formula area was, and then they got data for the population of the tribes in the formula area. You answered me earlier by saying you didn't have a formula area. Correct. So I'm trying to understand that answer and how that relates to what occurred for these other tribes that didn't participate in the IHBG program. So as we understand from the government's position, as stated in their May 5th announcement, as what I believe you're referring to, Your Honor, they acknowledged that there were several tribes, three tribes that are not even in the IHBG program on the formula grant. And so they had to consult other information and they received other data from HUD. They don't say whether that data was based on a jurisdictional area or a formula area. The government in its own documentation says it asked HUD for the information. It could have done the same thing here, but it didn't. The government could have consulted with the BIA, who also had enrollment data on the tribe, but it didn't do that either. Or the government could have consulted with the certification document that the tribe submitted under penalty of perjury to see what the actual number was, but it didn't do that either. So instead it used a obviously false piece of data to award the tribe $100,000 instead of its fair share, something closer to the 3,000 population that the tribe actually has. And so that is part of the arbitrary and capricious nature of the government's action here. It had alternative data that was arguably more, in fact, factually more reliable than the zero population that the government used instead to make the award. Mr. Thomas, were you done with that, Judge Wilkins? Yes, Your Honor. I just have two quick questions for you. In a footnote in your blue brief, you make an argument that the funds here are not a lump sum appropriation, but rather a line item. Did you make that argument in the district court? We did not, Your Honor. We pointed out, though, that the lump sum appropriation falls outside of the purview of V-Hill. I thought you said it wasn't a lump sum, that it's a line item. Well, our argument below was that this particular appropriation falls outside of V-Hill, and we support that further by pointing out that this arguably is not even a lump sum distribution, that in fact it's a line item distribution, and we cite to the General Accounting Office's definition. But you didn't argue this, and is there a particular reason why you buried this in a footnote? No, Your Honor, other than to alert the court to the fact that there's an alternative explanation for why the V-Hill case should apply here. Your argument, then, I take it, is that even if this is a lump sum, that the language in the statute about basing the distribution of funds on tribal expenditures is enough of a standard. That's your argument, right? Yes, Your Honor. My second question is this. You say at one point in your brief that the government used participation in the IHBG program itself, participation in the program, as a prerequisite for receiving title fund funding. You say that at page 10. Is that, in fact, what happened? I mean, I couldn't find anything in the record that said that participation in that program was a prerequisite for the money. Your Honor, the inference is that instead of using the tribe's reported and population number, the government, in which they asked every tribe to submit, instead of using… Dan, I understand that's not what I was asking you. I get that argument, but I thought at page 10 you actually say that the money was distributed on the basis of the tribal participation in the IHBG program. But that's not accurate, is it? Well, it isn't. In fact, Your Honor, the result, because the Shawnee tribe… Yeah, okay. I understand your point. I think… Okay. And I see my time is up, Your Honor. Unless my colleagues have any other questions, we'll hear from the government. Good morning, and may it please the Court. Thomas Pullum for the Appellees. The CARES Act tasked the Secretary of the Treasury with distributing $150 billion in assistance to state, local, and tribal governments within 30 days. For some governmental units, the Act provided detailed instructions about how the amount of assistance should be determined. For tribal governments, however, Congress provided only general guidance and directed that the specific amounts would be determined by the Secretary in a manner that the Secretary determines appropriate. Excuse me. It's not determined by the Secretary. It's based on increased expenditures. You would be totally right about this if the statute said what you just said, that the money shall be distributed on the basis of standards adopted by the Secretary. But that's not what it says. It says, based on increased expenditures as determined by the Secretary. Let's just get to the core of this case. Why isn't that sufficient statutory evidence of both that this is judicially reviewable and that we have an accurate standard here? Let me just finish my question. Even if, as you say in your brief, that the Secretary's decision to use population data is not reviewable, certainly that population data must in fact be a proxy for increased expenditures. Certainly. So I think when we look at the statutory language, it says the amount that a tribe receives shall be the amount the Secretary shall determine that is based on increased expenditures and determined in such manner as the Secretary determines appropriate. So this reference to increased expenditures is kind of nestled within the Secretary's determination. And this court has said repeatedly that when we have... Does the Secretary have the discretion not to base it on increased expenditures? Well, I think it's an instruction to the Secretary, but it's the Secretary's determination whether this number is based on increased expenditures. And that's the language I think is comparable to cases like Webster and Drake and Claybrook that invoke more of a subjective standard rather than an objective standard. But in Drake, there's no standard. The only standard in Drake was, as the agency decided, I didn't say based on anything. It was just the Secretary should decide. And we said that that was very important in Drake. That was one of the facts. And, of course, Drake was a prosecutorial discretion case. So we could look at some of the other cases. Claybrook, for example, provided that an official could adjourn a hearing if the official determines that it was in the public interest. Right. So that's a very that's a wet yes. If this one said that the Secretary could distribute it as the Secretary determines in the public interest, that's a standard for which there are no standards. But the court says the court's analysis there wasn't based on the public interest. It said all we have to review is the official's determination of whether it was in the public interest. And it was that determination that made the difference, not the public interest standard. That's what this court. Well, well, the court said, I'm going to quote adjourning a meeting in quote in the public interest is the kind of decision that resists judicial review. So I don't think you're right that it's irrelevant that this was a public interest standard. Well, so, I mean, even if that part were could provide some kind of hook for review as the district court said that kind of that's not the challenge that the tribe actually brought here. They're challenging the manner in which the secretary calculated these amounts. I don't think that's accurate. Their argument, the secretary's position is that population data is an adequate proxy for increased expenditures. The tribe's argument is that it isn't. Well, I don't, with respect. It isn't. And it isn't because it isn't for this tribe, because the data said it had zero. It isn't for the amicus, because the secretary's data said it had zero. And it isn't for at least, at least we went through the list is at least 10 other tribes that came up zero. So their argument is goes directly to the secretary's rationale for using the IHBG data. Secretary said it was a proxy. The tribe says, No, it's not a proxy because it and other tribes came up zero, even though they have significant populations. That's their argument. So a couple of points here. One, this reference to increased expenditures. I mean, that itself is something that is not. That's not an objective, independent fact that's directly ascertainable. These are numbers that weren't known because the time period hadn't run yet. And they are, in fact, affected by the secretary's determination because how much a tribe spends will be. We all accept that. And that's why the secretary said it needed a proxy. Right. Yes. So maybe I'll walk through what the secretary said here. He said, as your honor indicated, by necessity and statutory design, there has to be an estimate. I'm focusing on expenditures that are specifically related to the public health emergency. And population corresponds with those types of expenditures, such as increased costs for medical and public health needs. And then the secretary specifically chose a population measure that is a measure of what's called the tribes formula area, which is the area of the tribal government's jurisdiction and other areas where the tribal government provides services with adjustments for overlapping. Yeah, I've read all that. I understand all that. Suppose the IHBG data here, suppose the results of it were totally random. In other words, suppose for whatever reason, it had absolutely no relationship to expenditures and the funds got distributed based on that. Would that not be reviewable by this court? Well, I don't think so for reasons the district court laid out, because I think that goes to the manner. But even even if so, I think we could look at this. Let me finish my question. So you're telling me that if if the population data produced random results, that is the money was distributed with no reference to the increased expenditure. In other words, it was, in fact, not based on increased expenditures. I use the word from the statute based on it would not be reviewable. That's your position. Well, I don't think we need to actually get that far because I don't think there's any real dispute that that was this population measure, in fact, covers. Isn't that the merits question? That's not the reviewability question. Now you're talking about the merits question. Well, so we perhaps this court's decision in Milk Train would be helpful there. In that case, the statute said that assistance, similar type of assistance would be distributed in a manner determined appropriate by the secretary to compensate for a certain year losses. The secretary there set a limit on eligible production levels so that no assistance for losses above those levels would be provided. The court said we can't review that because the statute left it to the secretary's discretion how to distribute those funds. The court didn't kind of ask whether the limit was unreasonable or had no relationship to losses. It said that's something the statute puts aside. Similarly, here. The whole second half of Milk Train, which was at the court, said that it could review whether the secretary compensated the milk producers for economic losses that occurred in 1999 rather than in prior years. And we didn't find there that that was unreviewable because it was kind of part and parcel of the ultimate discretionary decision. We said that the discretionary decision had to be based on that factor. So why isn't that exactly what we have here? Well, that's right. And the court undertook a very limited review just to assess that the secretary was there looking at the right thing, aiming at trying to calculate. It may not be that there's very much review, but there was review. And you're arguing that there is no review here. So why doesn't Milk Train sink your argument? I think it doesn't for the type of challenge that the tribe has brought, which is analogous to the kind of production limit challenge in Milk Train rather than the kind of purpose of challenge in Milk Train. But even if we're wrong on reviewability, the secretary's decision document laid out in the May 5th announcement and the FAQs establish a clear relationship between the increased expenditures and the specific population. Are you saying that we should go ahead and go to the merits? I thought you said that if we find reviewability, we should remand. I do think, I mean, that would be the norm. I agree. That is the normal course that this court says it should follow, would follow and should follow here. I was just trying to address if you had questions about that. But yes, the normal course when a district court issues an injunction on a basis that this court or denies an injunction on a basis that this court finds an abuse of discretion or involving legal error is to remand back to the district court for the discretionary weighing of the factors. And that is what this court should do. Let me ask you this. Two questions. One related to this point. One of your arguments in your brief for why this court should not address the merits is that the record isn't before the district court, right? We don't have the record. But we have the May 5th announcement. We have the data, the IHBG data spreadsheets. And we have this June 4th frequently asked questions. And the latter document basically answers every question. It says, it explains why the secretary selected the data, the data system it did. It explained why it didn't accept, it didn't use other data. It explained how it handled tribes who didn't show up in the database. What more do we need to decide this case? At a minimum, what more do we need to decide at least the preliminary injunction question? So I don't think you need anything more to decide the preliminary injunction question. You could do that on the same basis for what was before the district court. And I agree that this these documents lay out an adequate rationale. I think our argument was that if you were going to if you needed to engage in a kind of searching inquiry to what the secretary had before him, that would normally be done on the basis of the. I understand that. I understand that point. But speaking of the preliminary injunction, the district court, am I right about this? Just tell me if I'm right. The district court. The district court seemed to have accepted that there was irreparable injury. But that the tribe wouldn't succeed on the merits. You're not challenging the irreparable injury issue here, right? That's correct. And my last question is going back to our discussion earlier. OK, so, you know, we have to when we interpret a statute, we have to give meaning to all of its words. So what, in your view of the statute, do you think the phrase is based on increased expenditures of dot dot dot what what role does that language play in the statute? I think that's telling the secretary what he should base his determination of the amount paid. It should it should have a relationship to increased expenditures. And and say once more than why that isn't a sufficient limitation in the statute to make the secretary's ultimate decision reviewable. I think without telling me about the merits. I think because it is because it's nested in the secretary's determination, the secretary is determining what the increased expenditures are in a manner that he determines appropriate. And I think this brings up that kind of subjective standard of the type that I said at issue in Webster and Claybrook. CC distributors is another one where the secretary of defense there had to determine whether something must be done by the military. And this court says the statute doesn't provide a reference point for us to look at the only statutory reference would be the secretary's determination. And so it's that kind of distancing having having it be based on the secretary's determination, in combination with kind of a whole set of factors about this. The case law tells us to look at the type of administrative action we have the statutory structure and kind of the overall scheme. Here we have a structure that gave very detailed instructions for one part. No one's few instructions for another. It's distribution distribution of a set amount of funds over a limited period of time with an instruction that all of the funds have to be distributed. So the secretary can't just do one at a time. It has to be done kind of comprehensively. And we think all these facts suggest that this is unsuitable for judicial review. Mr. Cohn, thank you. We've got some more questions here. So I have three questions for you. The first is, imagine the secretary said, I'm going to base my determination on the alphabet and tribes that would begin with the letters A through M get the money tribes with M through Z do not. Would we be able to review that. So, I don't think so. Yes, that's sort of a yes or no question. You can you can explain, but I need a yes or no. Is that reviewable or not reviewable. No, but I don't think that you need to agree with me on that point in order to Know, I understand that you have a fallback position, but why no Because of kind of for the reasons I was trying to lay out before because of the The way this is focused on the secretary's determination. All right. If that's the case, how do you explain the Supreme Court's decision and Department of Commerce versus New York from last year. That's the census case in which the court, the same argument is made. And the Secretary said he had unreviewable decisions about what questions to include in the census court says we disagree. To be sure the section instructs the Secretary to quote take a decennial census in such form and content as he may determine Nonetheless, the court said it was reviewable because the census imposes a quote duty to conduct a sentence census. That is accurate and that fairly accounts for the crucial representational rights that depend on the census. That wasn't even from the statute that that was from a from a Supreme Court opinion. So there's a there's a case just last year from the United States Supreme Court in which the statute says as the Secretary may determine and which the court said that does not resolve the review ability question. What's your answer to that. So I think because then we're looking at what is being determined, which is an important thing here. The census count is kind of independent objectively Ascertainable Concept. These increased expenditures are not. It's something that Went to only to the question of what questions could be asked. And the statute said in such form and content as he may determine But, but I think it's court said that wasn't wasn't non reviewable Because I think the subject of what's being determined is is relevant and here what's being determined is something that doesn't exist independently of the Secretary's actions. Well, this does. Why doesn't this, this is this this statute is is pretty specific as to the basis. We've been saying increased expenditures, but dot dot dot but the rest of the sentence says based on increased expenditures of each said tribal government relative to aggregate expenditures and fiscal year 2019 I think for for two reasons. One, the increased expenditures haven't they haven't happened yet. But you can you can do it. You could have based it on how much the increased expenditures have happened so far, that would be an objective measure. Well, and second, There's a kind of circularity to this where the increased expenditures will be influenced by the Secretary's actions. So that the The amount of money that the Secretary provides will influence what the tribes actually spend Well, Congress didn't say that Congress said this is the way you do it. And it gives a pretty objective way to do it. I'm not saying you had to do it that way. I'm not saying you couldn't use a proxy. But the question is, is it reviewable at all. Let me, let me ask you another question, which Judge Tatel began with Questioning your colleague on the other side, which I don't see how this can be regarded as a lump sum expenditure. This is nothing like what happened in vigil where the court says Congress never expressly appropriated funds for the centers that were at issue in the case. That case, it came from a purely annual lump sum appropriation and and the GAO makes clear the difference. Yes, sometimes it's hard to know the difference between a line item. And a lump sum, but this isn't a large amount of money that the agents department can use for whatever it wants. And that puts into this thing. This is a specific Line item of money that has to be spent for a specific purpose. Why do you regard this as a lump sum I think for a few reasons. And I would just like to preface it. This is not an argument that we think the tribe actually makes We heard, we heard that in the back and forth between Judge Tatel and your colleagues. So now I just want to ask the question. About why Why you're not asking us to apply the wrong presumption here. I think it, it shares some features with the appropriation and lump sum. We have a general instruction of purpose and explicit I mean, in this case, explicit direction to the secretary to distribute it to kind of possible recipients as it as a secretary sees fit. It's also informed by kind of similar policy rationales, the nature of the task requires a considerable amount of judgment. The balance of factors. That is not the distinction between a lump sum. Judgment is not the distinction. Lump sum is when a large amount of money is given to an agency which can then distributed to various programs as it wishes. This is only one program. It has to be done for this purpose. No other purpose. Yes, you can. You have discretion as to how to do it for the purpose, but it's not like it can go for a different thing that the department thinks it needs the money for If this is lump sum almost everything that is appropriated as lump sum. So I take your point on on the differences. We thought that some of the Some of the policy rationales, you know, apply involving the balancing of factors that are An agency is better situated to do taking into account kind of what better advances the purposes and priorities. Where is that, where is, where are those factors in which case use those factors to determine the difference between a lump sum and a line item. Well, Lincoln V Vigil said that these are some of the factors that explain why the lump sum appropriation is unreviewable and we think that those factors apply here, but ultimately as this court has has emphasized repeatedly. This doesn't move the ball very far in one direction or the other. You don't think you get any advantage from calling it lump sum. I just want to make sure we know understand that. So you don't think it's a big deal at all presumption isn't much different. I mean, the presumption helps, but this court has said that it actually even if it flips it in the words of this court. It doesn't move the ball very far. Because judicial review is unavailable, regardless of which presumption applies one of review ability or non review ability. If there are no meaningful standards to cabin and agencies otherwise plenary discretion and we think that's the case here for reasons I've set out so Whether it falls under Lincoln V Vigil or, you know, something else that's not dispositive here. I mean, I think It's whether there's kind of a meaningful standard in the statute that is the dispositive question. Thank you, Judge. I don't want to intrude on Judge Garland here, but Ordinarily under the APA there's a presumption of reviewability. Correct. Yes. So, You're saying that it doesn't matter. If this is a lump sum Appropriation When the Supreme Court and our court has said that those there's a presumption of review ability with those I'm not saying it makes no difference. I just, it's kind of different ways of getting at A similar issue and ultimately what matters is whether the standard the statute provides a meaningful standard that this court can use to judge if it does, then Either A presumption against A presumption of non review ability is rebutted. If there's no standard no meaningful standard than a presumption of Review ability is rebutted. So ultimately, what's dispositive is the As I said, whether the statute sets out a meaningful standard to review a reference point that this court can use So turning to the facts of this case. Why was the population in the IHBG formula area for Shawnee zero My understanding, which the Council for the tribe has has confirmed is it it's because the Tribe doesn't have a formula area formula area. As I said, is generally the area that a tribe has jurisdiction over provide services and there are many different ways for a tribe to obtain a formula area, the kind of two most common and easily understandable would be if the tribe has a reservation or trust lands that it's responsible for This tribe does not have a formula area and the Secretary explained when As part of the selection of a population measure rejected enrollment data because it doesn't distinguish between The population that is within a tribal area and those that are outside and the Secretary was specifically focusing on expenditures related to the public health emergency. Such as increased costs for medical and public health needs and this selection of this measure reflected the belief that tribal governments would be best positioned to make expenditures for Emergency related issues for areas of the tribal where the tribe has jurisdiction and provide services so that that's the connection that was laid out in The tribes to tribes without formula areas have expenditures related to the pandemic. They might and the tribe here received received funds it received both an allocation under the population. That wasn't my question. Does do tribes without first of all tribes without formula areas have budgets and expenditures. Correct. Yes. Okay. And are those expenditures related to the pandemic. I mean, with those expenditures go up in 2020 over 2019 So they could the Secretary explained this a little bit in the May 5 document that he didn't look just at Kind of the 2019 budget and do a mechanical adjustment because that would capture some things that might be increased expenditures, but would not necessarily be Appropriate uses of the funds under Under the CARES Act. The CARES Act sets out certain requirements for the use of funds and the Secretary said specifically he was focusing on The distribution of the full allocation of funds to a tribe. Depends on whether it has or doesn't have a formula. Because that seems to be the distinction here right the tribes. The tribes that see if I'm right about this, this tribe and the amicus and the others that came out to be zero. They are all tribes, presumably don't have formula areas, whereas the tribes. There were There. The database, the HUD database. I'm just leaving my notes included Some non eligible tribes and excluded three drives completely, but I assume those were all tribes which the Secretary reached out to to get accurate data right those were Those had formulas. Those three tribes did have formula areas. That's what the Secretary The Secretary seems to be making here right that that That money will be distributed under the HUD database to tribes to full the full on the two tribes that have formula areas that those without formula areas get 100 grand right With respect to the population component of the There were other components that Yeah, well taken point. I understand that. So where do we look in the record to find that the why the Secretary thought that the presence or absence of a formula area was somehow Related to The increased expenditures from 2019 to 2020 So I think there are two places at the appendix 99 to 100 The Secretary explains how this population measure is based on formula area which corresponds broadly to jurisdiction jurisdiction and where the tribe provides services and incorporates adjustments to address overlapping Jurisdictions and then in the FAQs at appendix 103 and 104 The Secretary Talked about how tribal enrollment doesn't distinguish between members living within the tribal area and those living outside the tribal area. Whereas formula area does kind of make that distinction. So this reflects the belief that tribes would be kind of better positioned to make expenditures for the public health emergency in the areas where they Provide services. The Secretary also identified other reasons why he chose this Measure it's he said explained consistent and reliable. It's updated annually using the same census data that Congress required Treasury to use for the allocations to state and local governments. That's the population estimate program. I believe it's called It's also familiar. This formula was conducted through negotiated rulemakings with tribes. Read all of that, but I don't think that any of it really answers the question of why It's it's a fair assumption or or it's rational or reasonable to assume that a tribe with no formula area doesn't provide any services. So I don't think that is this is Secretary certainly didn't take that view. That's why, among other reasons, there's more than one component to the award. There's also an employment. Component and one that's just tied to actual expenditures that had been incurred by the time The award was made. So this tribe obtained over $500,000 through in that that second Allotment. I think what the Secretary was what he explained here was that he was focusing on expenditures due to the public health emergency that population was expected to correspond to that and that specifically Kind of tribes would be most likely you know best position to Make expenditures for The population living within their area, the statute doesn't create an entitlement to kind of a penny for penny reimbursement of increased expenditures. I mean, that's impossible, given the twin.  Goals here of having a fixed amount that he could distribute and a requirement that all the money be given out in a quick period of time, kind of all at once. So this has to be done with an eye towards The whole program giving one tribe more necessarily means that the other tribes receive less. So this has to be done by kind of a general formula. That works, kind of, on the whole, there may be, you know, certain tribes that come out better and certain that come out less, but that doesn't make it an unreasonable. Action, especially in the circumstances we have here. Judge Wilkins, Judge Garland, any further questions. Oh, thank you. No. Thank you. Thank you. We've got your argument. Mr. Zucker, I think you had a little time. Mr. Zucker, Miss Thomas. I think you have a few minutes. No. Yes, Thomas time left. Pardon me. Miss Thomas had no time left. Okay, Miss Thomas, you can take a minute. Okay, thank you, Your Honor. A couple of points then real quick. First of all, This won't come out of your minute, I promise. But do you agree with Mr. Pollan that the reason your client didn't showed up with zero is because it doesn't have a formula area? Is that the reason? Yes, that's the way the, yes, yes, Your Honor. That's the way the IHBG program works. Okay, good. So a couple of points real quick. First, with respect to the reviewability and the meaningful standards, the United States, the government would have you believe that the only part of the CARES Act that's relevant here is the last half of the sentence. The words that follow and a determination as the secretary shall determine in order to ensure that the monies are expended. So there's two sets of components here. The first is how much money should tribes get. And the second is making sure that all of the money is distributed. And the government's focused on that last standard of making sure all of the money is distributed. And so this court is rightly pointed out that the first part of the sentence. And as a reminder, this court ruled in the Chehalis versus Mnuchin case, a related case, that it has the ability to review the government's spending decisions here. And so it's already looked at this language, the exact same sentence, the exact same wording to find that the government's actions here are reviewable. Secondly, with respect to the merits, and I know that the court was asking about the merits, the use of the IHBG formula is obviously in error because it is in error. The data in the formula with respect to the Shawnee tribe is clear error. It is clearly false. And so to the extent that this court, we believe, can and should look to the merits of the case, certainly in the interest of time and in the interest of judicial economy. And since this court owes no deference to the lower court, it owes no deference to the government's decision. It sits in appellate review of the government's decision. As this court has already pointed out, the relevant facts are already in front of it with respect to the reasonableness. If we were to review this, isn't our review, as you have, you know, pled this case, doesn't it really boil down to whether it was arbitrary and capricious for the government to assign zero population to those tribes that had no formula area? Isn't that really the question that we would review? That's the heart of the question, Your Honor. The heart of the question is whether a zero population number, which is obviously false and legally impossible, whether that is textbook, arbitrary and capricious and contrary to the law. The law says tribes. I think that the argument's a little different than that. It's not whether the number is false. It's whether whether formula area is a adequate proxy for increased expenditures. Right. We think both questions, Your Honor. We challenge the use of the IHBG formula, which uses the formula area, which the tribe doesn't have. And then we challenge the use, the selection of the zero population, notwithstanding, of course, the fact that there's additional data for the federal government. So for the federal government to use obviously false data in its decision is, in fact, textbook, arbitrary and capricious, even if the formula, the selection of IHBG is reasonable, which we don't waive that argument. But even if it is a reasonable formula to use, the purposeful selection of zero population when there was other data available to the government to use is it's also arbitrary and capricious. And so we would suggest that this court can, in fact, reach the merits of the case. Again, it owes no deference to the lower court. But if the court decides not to reach the merits of the case, then we certainly ask this court to overturn the lower courts dismissal of our preliminary injunction motion, because we believe we will win on the on the merits of the case. The government has admitted and the lower court has found that there is irreparable harm. And so for those reasons, we would ask this court to certainly overturn the motion to dismiss reinstating our claim to find in favor of the tribe on the merits and awarding the tribe the $12 million that it seeks. Alternatively, if the court does not reach the merits, we ask it to overturn the preliminary injunction motion and remand for further proceedings. OK, thank you. Mr. Palm, thank you both. The case is submitted.
judges: Tatel, Garland, Wilkins